**ENTERTAINMENT RESEARCH GROUP, INC., a California corporation, Plaintiff–Appellant,**

v.

**GENESIS CREATIVE GROUP, INC., a Michigan corporation; Aerostar International, Inc., a South Dakota Corporation, Defendants–Appellees,**

and

**The Quaker Oats Company, Defendant.**

Nos. 95–17123, 96–16689.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 17, 1997.

Decided Aug. 18, 1997.

Roberta L. Cairney, James Gibbons–Shapiro, Fenwick & West, San Francisco, California, and Earl L. Bohachek, Rubenstein and Bohachek, San Francisco, California, for plaintiff-appellant.

Kirkland W. Garey, Howard & Howard, Bloomfield Hills, Michigan (Henry Chun and Douglas P. Drayton, Robins, Kaplan, Miller & Ciresi, San Francisco, California, on the briefs), for defendant-appellee Genesis Creative Group, Inc.

Stephen W. Sommerhalter, Buchalter, Nemer, Fields & Younger, San Francisco, California, for defendant-appellee Aerostar International, Inc.

Ronald L. Yin, Limbach & Limbach, San Francisco, California, for amicus curiae.

Before: D.W. NELSON and FERNANDEZ, Circuit Judges, and REA,* District Judge.

* The Honorable William J. Rea, United States District Judge for the Central District of California, sitting by designation.

1. ERG filed two separate appeals—one from the district court's orders regarding summary judgment and one from the district court's award of attorneys' fees. These two appeals were consolidated and heard together.

REA, District Judge:

Entertainment Research Group, Inc. ("ERG") appeals from two separate orders by the district court granting partial summary judgment in favor of defendants Genesis Creative Group, Inc. ("Genesis") and Aerostar International, Inc. ("Aerostar") and from a third order awarding attorney's fees to defendant Genesis.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291 and 17 U.S.C. § 505. We affirm the district court's orders granting partial summary judgment, but we vacate and remand the award of attorney's fees.

## BACKGROUND

ERG designs and manufactures three-dimensional inflatable costumes that are used in publicity events, such as shopping mall openings. The costumes are approximately eight feet tall and are worn by a person who remains inside the costume. Various companies purchase and use these costumes to promote their products. The costumes are based upon these companies' cartoon characters.[2]

ERG has manufactured and sold these walk-around inflatable costumes for the past sixteen years. Over this time, ERG has developed techniques and designs that have resulted in high-quality, attractive, durable and comfortable inflatable costumes. Up until the Spring of 1991, ERG was allegedly the only manufacturer utilizing these techniques. ERG is owned by Allen Edward "Ed" Breed. Mr. Breed is also ERG's president and sole shareholder.

Appellee/defendant Genesis is in the business of marketing promotional and advertising devices to various companies, including Kraft, General Mills, Quaker Oats and Pillsbury. Appellee/defendant Aerostar is a manufacturer of hot air balloons, cold air in-

2. For example, Pillsbury purchased "Pillsbury Doughboy" costumes, Toys "R" Us purchased "Geoffrey the Giraffe" costumes, and Quaker Oats Company purchased "Cap'n Crunch" costumes.

flatable products and cold air walk-around costumes.

In 1989, ERG and Genesis began a business relationship—a relationship that has evolved into this lawsuit. Genesis describes the relationship as that of manufacturer (ERG) and wholesaler (Genesis). ERG describes it as a principal (ERG)-agent (Genesis) relationship that was created by an oral contract under which Genesis was to sell exclusively ERG's products and related repair and maintenance services on a commission basis.

Although the parties dispute who contacted whom first, we know that on February 27, 1989, Mr. Breed sent a letter to Genesis's vice-president of sales, Glenn Bodien, outlining Mr. Breed's proposed structure for the relationship. Soon after, ERG's inflatable costumes were being sold to Genesis's customers. By September, 1990, more than forty-eight ERG-manufactured costumes had apparently been sold and distributed by Genesis to at least nine different companies, representing thirteen different cartoon characters.

On September 18, 1990, ERG and Genesis entered into and signed a "Confidential Disclosure Agreement." This agreement states that Genesis shall not disclose "valuable and proprietary technical information" and that Genesis shall not duplicate any of ERG's costumes.

Up until August, 1991, Genesis apparently continued to solicit customers for ERG-manufactured costumes. The parties disagree on how their business relationship came to an end. ERG claims that Genesis secretly entered into an agreement with Aerostar while the ERG–Genesis relationship was still alive and that Genesis supplied Aerostar with ERG-made costumes and ERG's proprietary information so that Aerostar could enter into the inflatable costume industry and so that Genesis could get itself a better deal through Aerostar. On its part, Genesis contends that it was forced to end the relationship due to ERG's failure to produce and service costumes in the timely manner required by Genesis's customers. In any event, on August 23, 1991, Genesis gave ERG written notice of the termination of all future business relations.

Shortly thereafter, Genesis apparently entered into a formal business relationship with Aerostar to sell inflatable walk-around costumes manufactured by Aerostar to Genesis's customers. ERG claims that Genesis and Aerostar had been meeting prior to the August, 1991 termination of the ERG–Genesis relationship. Genesis and Aerostar deny the existence of any such secret meetings and plans.

ERG also claims that Genesis and Aerostar conspired to divert former and potential customers away from ERG to themselves both for costume purchases and for maintenance and repair services. ERG specifically alleges that Genesis made misrepresentations about ERG's prices and ability to provide requested services and that Genesis engaged in a variety of other schemes designed to disrupt ERG's business relationships and to create a demand for Aerostar-manufactured costumes.

ERG further claims that Genesis provided Aerostar with examples of ERG-manufactured costumes so that Aerostar could learn how to manufacture the complicated and intricate costumes and so that Aerostar could copy the costumes. In addition, ERG alleges that Aerostar employees ripped out and pasted over ERG's copyright labels in ERG-manufactured costumes without the approval and/or knowledge of ERG. Finally, ERG claims that Genesis and Aerostar distributed advertising materials depicting ERG-manufactured costumes without ERG's approval.

On June 30, 1992, ERG initiated this action by filing a complaint in the United States District Court for the Northern District of California against defendants Genesis and Aerostar. A second amended complaint was filed on September 29, 1993. The second amended complaint contained the following twelve causes of action: (1) copyright infringement against Genesis for infringing ERG's "Inflatimation Elf" costume; (2) copyright infringement against Genesis for infringing ERG's "Inflatimation Soldier" costume; (3) breach of written contract against Genesis; (4) breach of oral contract against Genesis; (5) copyright infringement against Aerostar for infringing ERG's derivative works; (6) intentional interference with con-

tract against both defendants; (7) negligent interference with contract against both defendants; (8) intentional interference with prospective economic advantage against both defendants; (9) negligent interference with prospective economic advantage against both defendants; (10) false designation of origin (Lanham Act) against both defendants; (11) unfair business practices/unfair competition against both defendants; and (12) civil conspiracy against both defendants.

On May 2, 1994, the district court granted partial summary judgment for Genesis and Aerostar on ERG's derivative copyright infringement claim (ERG's fifth cause of action).[3] *See Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 853 F.Supp. 319 (N.D.Cal.1994). The district court did so on the ground that ERG did not possess valid copyrights in its three-dimensional inflatable costumes that ERG designed and manufactured based upon the preexisting copyrighted two-dimensional cartoon characters.

Genesis and Aerostar thereafter filed motions for partial summary judgment as to ERG's eleven remaining causes of action. At that hearing, ERG stipulated that it did not have any evidence to support its first and second causes of action for copyright infringement involving the Inflatimation Elf and Inflatimation Soldier costumes (the "Inflatimation" claims). On September 6, 1995, the district court issued an order granting Genesis and Aerostar's motions for partial summary judgment, finding that ERG had not established a genuine issue of material fact as to any of its remaining causes of action.[4]

Pursuant to 17 U.S.C. § 505, Genesis and Aerostar subsequently filed separate motions to recover attorney's fees incurred in defending against ERG's copyright causes of action—claims 1 and 2 (the Inflatimation claims) and claim 5 (the derivative copyright claim). The district court denied Aerostar's request for attorney's fees in its entirety and

denied Genesis's request for attorney's fees with regard to the derivative copyright claim. However, the district court awarded attorney's fees to Genesis in the amount of $195,-759.00 for having to defend against ERG's Inflatimation claims.

The district court's calculation of attorney's fees was soon determined to be erroneous by the parties. Apparently, the amount of the award included the attorney's fees that Genesis had incurred in defending against the derivative copyright claim. Accordingly, ERG filed a motion to amend. On October 2, 1996, the district court issued an amended order which lowered the award of attorney's fees to Genesis to $95,075.75.[5]

### STANDARD OF REVIEW

■ The district court's decision to grant summary judgment is reviewed de novo. *See, e.g., Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relative substantive law. *Id.* The district court's interpretation of state law is reviewed under the same de novo standard that is used to review questions of federal law. *See, e.g., Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1220–1222, 113 L.Ed.2d 190 (1991).

■ The district court's decision to award attorney's fees under the Copyright Act, 17 U.S.C. §§ 101–1101, is reviewed for an abuse of discretion. *See, e.g., Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 556 (9th Cir. 1996). However, "[A]ny elements of legal analysis and statutory interpretation which figure in the district court's decision are reviewable de novo." *Hall v. Bolger*, 768 F.2d 1148, 1150 (9th Cir.1985). A district court's award of attorney's fees "does not constitute

---

3. Although this cause of action was solely brought against Aerostar, by virtue of ERG's catch-all twelfth cause of action for conspiracy, the second amended complaint made it so that each defendant is potentially liable for each cause of action.

4. An amended order was issued by the district court on September 11, 1995.

5. The district court arrived at this amount by excluding any fees incurred after September 29, 1993—the date when the derivative copyright claim was first brought.

an abuse of discretion unless it is based on an inaccurate view of the law or a clearly erroneous finding of fact." *Fantasy*, 94 F.3d at 556.

## DISCUSSION

The district court granted summary judgment against ERG on all twelve of ERG's causes of action. ERG has not appealed the district court's grant of summary judgment as to claims 1 and 2—the Inflatimation claims. ERG's opening brief failed to make any mention of the following causes of action: (1) intentional interference with contractual relations; (2) negligent interference with contractual relations; (3) intentional interference with prospective economic advantage; and (4) negligent interference with prospective economic advantage. In addition, ERG's opening brief provided only cursory mention, with virtually no discussion, of ERG's Lanham Act and unfair competition/unfair business practices causes of action.

■ We will not consider any claims that were not actually argued in ERG's opening brief. As we stated in *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir.1994):

> We review only issues which are argued specifically and distinctly in a party's opening brief. We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review. As the Seventh Circuit in *Dunkel* stated aptly: "[j]udges are not like pigs, hunting for truffles buried in briefs."

*Id.* (citations omitted). Accordingly, because ERG failed to "present a specific, cogent argument for our consideration" with regard to these causes of action, we will not discuss them. *Id.* As a result, the only issues to be addressed are: (1) ERG's derivative copyright claim; (2) ERG's breach of contract claims; (3) ERG's civil conspiracy claim; and (4) the award of attorney's fees. We address each of these claims independently.

## I. Derivative Copyright Infringement Cause of Action

■ ERG alleges that Aerostar copied and infringed ERG's copyrights in the inflatable costumes that ERG designed and manufactured based on the underlying copyrighted characters. To establish copyright infringement, the holder of the copyright must prove both valid ownership of the copyright and infringement of that copyright by the alleged infringer. *See, e.g., North Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1033 (9th Cir.1992); *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir.1977). If the plaintiff copyright holder survives the first step by establishing that he or she owns a valid copyright, the plaintiff must then establish infringement by showing both access to the copyrighted material on the part of the alleged infringer and substantial similarity between the copyrighted work and the alleged infringing work. *North Coast*, 972 F.2d at 1033.

In the instant case, the district court granted the motions for summary judgment on the infringement claim on the ground that ERG failed to establish that it had a valid copyright in its costumes. *See Entertainment Research Group*, 853 F.Supp. at 324. We agree.

### A. Copyright Registration Certificates

■ Under the copyright laws, the registration of a copyright certificate constitutes prima facie evidence of the validity of a copyright in a judicial proceeding commenced within five years of the copyright's first publication. 17 U.S.C. § 410(c); *see also North Coast*, 972 F.2d at 1033; *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 668 (3rd Cir.1990); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085–86 (9th Cir.1989). A certificate of copyright registration, therefore, "shifts to the defendant the burden to prove the invalidity of the plaintiff's copyrights." *Masquerade Novelty*, 912 F.2d at 668; *see also Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 832 (10th Cir.1993). An accused infringer can rebut this presumption of validity, however. *See, e.g., North Coast*, 972 F.2d at 1033; *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980). To rebut the presumption, an infringement defendant must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement. *See, e.g., North Coast*, 972 F.2d at 1033; *Folio Impressions, Inc. v.*

*Byer California,* 937 F.2d 759, 763 (2d Cir. 1991).

■ It is undisputed that on September 23, 1993, the United States Copyright Office issued certificates of copyright registration to ERG for its "Toucan Sam," "Dino," "Dough Boy," "Little Sprout," "Cap'n Crunch," "Geoffrey the Giraffe," and "Oatis Oat Square" costumes. ERG argues that the district court committed a clear error of law requiring reversal by failing to give anything but "lip service" to the presumption of validity for these copyrights. We disagree. ERG's argument is based on the district court's statement that, "Since Aerostar has put ERG's copyrights in dispute, ERG must prove the validity of its copyright as a threshold issue." *Entertainment Research Group,* 853 F.Supp. at 321. Although a literal reading of the district court's statement could lead one to conclude that the district court erroneously shifted the burden of proving copyright validity back to ERG before any evidence had been considered by erroneously requiring ERG to prove validity as a "threshold issue," a reading of the entire district court order makes clear that the district court did not improperly deny ERG of the statutory presumption of validity.

Aerostar—the alleged infringer—presented photographs and artwork of the original copyrighted figures to the district court. These materials raised a serious question as to whether ERG's costumes based on those copyrighted characters were sufficiently "original" to merit copyright protection. Such a showing is critical given our holding in *North Coast* that the statutory presumption of validity can be rebutted if the alleged infringer demonstrates that the plaintiff's work "is not original but copied from another's work." *North Coast,* 972 F.2d at 1033; *see also Masquerade Novelty,* 912 F.2d at 668–69 (stating that, "Where, for example, the issue is whether the copyrighted article is 'original,' the presumption will not be overcome unless the defendant offers proof that the plaintiff's product was copied from other works or similarly probative evidence as to originality."). These photographs and artwork reveal that ERG's costumes are quite similar in appearance to the copyrighted characters the costumes are based on. Accordingly, because Aerostar had offered evidence that ERG's costumes were "not original but copied from another's work," the district court properly held that Aerostar had rebutted the statutory presumption, and the district court properly shifted the burden of proving validity—the threshold issue for copyright infringement lawsuits—back to ERG. *See, e.g., Masquerade Novelty,* 912 F.2d at 668–69; *Carol Barnhart Inc. v. Economy Cover Corp.,* 773 F.2d 411, 414 (2d Cir.1985); *Durham,* 630 F.2d at 908–09 (holding that the presumption of validity was rebutted where "one look" at the plaintiff's allegedly copyrightable figures revealed a complete absence of any originality).

## B. *Copyrights in Derivative Works*

■ Having discussed this initial "threshold" issue, we will now evaluate whether ERG's costumes are actually copyrightable. It is undisputed that ERG's costumes are based upon two-dimensional characters that are copyrighted and owned by the purchasers of the costumes. The Copyright Act defines a derivative work as:

> [A] work based upon one or more preexisting works, such as a[n] ... art reproduction ... or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101. Given this definition, it is clear that ERG's costumes are derivative works for purposes of the Copyright Act.[6]

That ERG's costumes are derivative works is not a bar to their copyrightability, however. Section 103(a) of the Copyright Act explicitly provides that the subject matter of copyright, as specified by Section 102, includes "derivative works." 17 U.S.C. § 103(a). Nevertheless, the copyright protection afforded to derivative works is more

---

**6.** ERG even registered its copyrights in its costumes as derivative works based on the two-

dimensional copyrighted characters.

limited than it is for original works of authorship. Specifically, Section 103(b) provides that the copyright in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." 17 U.S.C. § 103(b); *see also Russell v. Price,* 612 F.2d 1123, 1128 (9th Cir.1979). Accordingly, we will now examine whether ERG's costumes are copyrightable as derivative works.

We have not previously had occasion to provide much guidance with regard to the copyrightability of derivative works. *See Moore Pub., Inc. v. Big Sky Marketing, Inc.,* 756 F.Supp. 1371, 1374 (D.Idaho 1990) (looking to cases from the Second Circuit and the Seventh Circuit for guidance on the standards to be employed in determining whether derivative works are copyrightable). Faced with this lack of guidance, the district court turned to the Second Circuit's decision in *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905 (2d Cir.1980), as a model for determining whether ERG's derivative works were copyrightable. *See Entertainment Research Group,* 853 F.Supp. at 321–22. ERG argues that the district court should not have relied on that test since the *Durham* test is not the controlling law of the Ninth Circuit and since the *Durham* analysis is premised on an erroneous interpretation of copyright law.

Instead of the *Durham* test, ERG contends that the district court should have applied the test created by a district court in the Central District of California. *Doran v. Sunset House Distributing Corp.,* 197 F.Supp. 940 (S.D.Cal.1961), *aff'd, Sunset House Distributing Corp. v. Doran,* 304 F.2d 251 (9th Cir.1962). In *Doran,* we affirmed the district court's decision that a three-dimensional, inflatable representation of Santa Claus was original and copyrightable. The district court in that case reached its decision based on its belief that the "test of copyrightability must be the form which the author has used to express the figure, idea, or theme." *Id.* at 944. In other words, under the *Doran* district court's test, if the form of the derivative work and the form of the underlying work—three-dimensional, two-dimensional, plastic, etc.—are sufficient-

ly different, then the derivative work is original enough to be copyrightable.

 ERG argues that the *Doran* test should apply to the instant case since it has never been overturned and is, therefore, the controlling law in this Circuit on the copyrightability of three-dimensional representations of preexisting two-dimensional works. We disagree. In the first place, the *Doran* test is inapplicable to the instant circumstances since *Doran* involved the copyrightability of a derivative work where the preexisting work was taken from the public domain and not copyrighted itself. Here, on the other hand, ERG's costumes were based on preexisting works that were copyrighted and owned by the ultimate purchasers. This difference is critical because in deciding whether to grant copyright protection to a derivative work, courts must be concerned about the impact such a derivative copyright will have on the copyright privileges and rights of the owner of the underlying work. *See* 17 U.S.C. § 103(b). Indeed, the body of law regarding derivative copyrights is designed to strike a balance between the holder of a copyright in the underlying work and the creator of a work that is made by copying that underlying work. *See, e.g., Durham,* 630 F.2d at 910–11. Accordingly, because the *Doran* test completely fails to take into account the rights of the holder of the copyright for the underlying work, the *Doran* test should not be applied to determine the copyrightability of a derivative work that is based on a preexisting work that is itself copyrighted.

In addition, it is not clear that we ever adopted the *Doran* test since our opinion affirming the district court's decision really focused on the similarity between the Santa Claus products at issue, rather than on the different "forms" of the products. *See* Melville B. Nimmer, *Nimmer on Copyright,* § 2.08[C] at 2–111, 2–112 n. 136 (commenting that the Ninth Circuit "apparently relied upon the originality inherent in the graphic elements of the plaintiff's Santa Claus, rather than on the grounds for originality stated by the district court."). In this respect, it is notable that although we quoted *Doran* in *Runge v. Lee,* 441 F.2d 579, 581 (9th Cir.

1971), for the standard for "originality" in copyrights, the portion of *Doran* that was quoted had nothing to do with the district's court's language indicating that a change in "form" is sufficient for originality purposes. *Id.*

In direct contrast, we are satisfied that the test developed by the Second Circuit in *Durham* is the proper approach for us to apply in the instant circumstances to determine whether ERG's costumes are copyrightable as derivative works. This test contains two prongs:

First, to support a copyright the original aspects of a derivative work must be more than trivial. Second, the original aspects of a derivative work must reflect the degree to which it relies on preexisting material and must not in any way affect the scope of any copyright protection in that preexisting material.

*Durham*, 630 F.2d at 909.

The first prong of the *Durham* test is in harmony with numerous decisions of this Circuit which establish that the original aspects of a work must be "more than trivial" to warrant copyright protection. *See, e.g., North Coast*, 972 F.2d at 1033 (stating that "[o]riginality is the indispensable prerequisite for copyrightability"); *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 657 F.2d 1059, 1061 (9th Cir.1981) (holding that "[o]riginality is the sine qua non of copyrightability").

ERG takes issue with the second prong of the *Durham* test, arguing that it embodies an erroneous interpretation of the copyright laws. We are not persuaded by this argument, as we believe that this prong is completely consistent with Section 103(b) of the Copyright Act and is, in fact, necessary because of Section 103(b). Section 103(b) provides that:

The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

17 U.S.C. § 103(b). Following the direct language of § 103(b), the second prong of the *Durham* test is designed to ensure that copyright protection is not given to a derivative work if doing so would necessarily affect the scope of any copyright protection in the preexisting material.

Viewed from another perspective, this second prong of the *Durham* test is necessary to ensure that copyright protection is not given to derivative works whose originality is merely trivial. Section 103(b) mandates that the copyright protection for derivative works not affect the scope of any copyright protection in the underlying work. Copyright protection for underlying works would be affected—and, thus, § 103(b) would be violated—if derivative works without adequate originality were given copyright protection. *See, e.g., Gracen*, 698 F.2d at 304–05; *Durham*, 630 F.2d at 910–11; *Moore Pub.*, 756 F.Supp. at 1374. This is so because if copyright protection were given to derivative works that are virtually identical to the underlying works, then the owner of the underlying copyrighted work would effectively be prevented from permitting others to copy her work since the original derivative copyright holder would have a de facto monopoly due to her "considerable power to interfere with the creation of subsequent derivative works from the same underlying work." *Gracen*, 698 F.2d at 305; *see also Durham*, 630 F.2d at 911. This conclusion finds support in our decisions in the somewhat analogous context where we have decided not to grant copyright protection to an artist's presentation of a song—even under an unfair competition theory—where doing so would undermine the rights of the song's copyright holder by exposing her licensees to potential litigation. *See Sinatra v. Goodyear Tire & Rubber*, 435 F.2d 711, 718 (9th Cir.1970).

Our belief that the *Durham* test is the proper approach is furthered by the fact that the principles underlying this test have been followed and approved of by many other courts. *See, e.g., Gracen*, 698 F.2d at 304–05; *EFS Marketing, Inc. v. Russ Berrie & Co., Inc.*, 836 F.Supp. 128, 131, 133 (S.D.N.Y. 1993); *Moore Pub.*, 756 F.Supp. at 1374; *M.S.R. Imports, Inc. v. R.E. Greenspan Co., Inc.*, 1983 WL 1778, *17 n. 4 (E.D.Pa.1983).

## C. Application to the Instant Facts

Having concluded that the *Durham* analysis is the proper approach to take, we will now apply the test to the instant circumstances.

### 1. Prong One: Originality

■ The first issue is whether ERG's costumes are sufficiently "original" to justify protection as derivative works. We have explained what "originality" means in the context of derivative works as follows:

All that is needed to satisfy both the Constitution and the statute is that the "author" contributed something more than a "merely trivial" variation, something recognizably "his own." Originality in this context "means little more than a prohibition of actual copying." No matter how poor artistically the "author's" addition, it is enough if it be his own.

*Sid & Marty Krofft Television,* 562 F.2d at 1163 n. 5 (citations omitted); *see also North Coast,* 972 F.2d at 1033.

Before assessing whether ERG contributed something more than a merely trivial variation to the underlying copyrighted characters in the creation of its costumes, one more complexity needs to be added to the mix. Although the category of costumes has rarely been dealt with in the copyright context, it seems clear that for copyright purposes, costumes would fall under the category of "pictorial, graphic and sculptural works" and would be treated as sculptural works. *See* 17 U.S.C. § § 101, 103. This fact is critical to our determination, as Section 101 of the Copyright Act states that sculptural works of artistic craftsmanship receive copyright protection only

insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article [ordinarily not copyrightable] ... shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

17 U.S.C. § 101.

Accordingly, any aspects of ERG's costumes that are purely functional, utilitarian or mechanical, will not be given any copyright protection. *Id.; see also Fabrica Inc. v. El Dorado Corp.,* 697 F.2d 890, 893 (9th Cir.1983). Moreover, any artistic aspects of ERG's costumes will also not receive copyright protection unless they can be identified separately from, and are capable of existing independently of, the utilitarian purpose of the costumes. 17 U.S.C. § 101; *see also Fabrica,* 697 F.2d at 893.

Based on this statutory provision, the district court ruled that, "Any differences in appearance between a derivative work and the preexisting work which are driven primarily by a functional, utilitarian or mechanical purpose cannot be considered when seeking artistic differences for the purpose of originality." *Entertainment Research Group,* 853 F.Supp. at 322–23. ERG argues that the district court committed clear error by utilizing this "functionality" test—which ERG contends should only be used to determine if a sculptural work is ultimately copyrightable—to determine whether a derivative work is sufficiently original in the first place. In other words, ERG contends that the district court should have first made the traditional originality determination by examining whether any aspect of the derivative works— including the purely utilitarian aspects—created sufficient originality and then, second, used the functionality test to determine if the artistic aspects of the derivative works were conceptually separable from the utilitarian aspects such that the costumes could be copyrightable as sculptural works.

We disagree with ERG's analysis. In the instant circumstances, where the derivative works at issue are sculptures, it makes no sense to include the utilitarian aspects for purposes of determining originality when it is clear, in light of § 101 of the Copyright Act, that these utilitarian aspects are not copyrightable. Thus, ERG would illogically have the courts consider the uncopyrightable elements of a derivative work in order to deter-

mine if the derivative work is ultimately copyrightable.

A simple hypothetical may help explain how futile the approach ERG is suggesting would be. Under ERG's approach, a court could determine that a sculptural work is sufficiently original to qualify as a derivative work even if the derivative sculpture had absolutely no new artistic elements to it so long as the sculpture had at least one purely functional, non-trivial element to it that the author of the derivative sculptural work contributed. At the second stage of the ERG approach, however, the court would be forced to conclude that the derivative work was not copyrightable as a sculptural work pursuant to 17 U.S.C. § 101 since it did not possess any new, non-trivial artistic features. Under such a scenario, the entire first step of the analysis would, therefore, have been pointless. Thus, because any utilitarian, functional or mechanical aspects of a derivative work will not be copyrightable in the long run, *see* 17 U.S.C. § 101, any differences in appearance between a derivative work and the preexisting work which are not conceptually separable from any utilitarian, functional or mechanical purposes should not be considered by a court in determining whether sufficient artistic differences exist to constitute "originality." Accordingly, the district court was correct to eliminate any such differences from its originality analysis.

Having said this, it is now necessary to evaluate whether ERG raised a genuine issue of fact as to whether the non-functional aspects of the ERG costumes were sufficiently original. *See, e.g., North Coast,* 972 F.2d at 1034 (stating that summary judgment is appropriate "where no reasonable trier-of-fact could find even trivial differences in the designs" which were claimed to be copyrightable). Addressing this very issue, the district court concluded that "no reasonable trier-of-fact could find even trivial artistic differences in design between the preexisting work and the underlying work." *Entertainment Research Group,* 853 F.Supp. at 323.

We agree with the district court that any artistic differences in the costumes are merely trivial. ERG alleges that Mr. Breed's declaration demonstrates that ERG contributed much that is "recognizably its own" to the costumes since Mr. Breed had to make a number of creative decisions to enable the costumes to be manufactured successfully and since Mr. Breed was guided by his "artistic impression." The problem with ERG's argument, however, is that originality is not present solely because Mr. Breed placed a lot of thought and effort into figuring out how to transform the two-dimensional copyrighted characters into three-dimensional inflatable costumes. *See, e.g., Feist,* 499 U.S. at 352–56, 111 S.Ct. at 1291–93; *Durham,* 630 F.2d at 911 (stating that a display of manufacturing skill is not independently enough to constitute originality). Indeed, the courts and commentators seem to agree that making decisions that enable one to reproduce or transform an already existing work into another medium or dimension—though perhaps quite difficult and intricate decisions—is not enough to constitute the contribution of something "recognizably his own." *See, e.g.,* Nimmer, § 2.08[C] at 2–111 (stating that the "mere act of converting two dimensions to three dimensions, although it creates a distinguishable variation, may not represent a contribution of independent effort because no one can claim to have independently evolved the idea and technique of working in three dimensions"); *Durham,* 630 F.2d at 911 (holding that, "The mere reproduction of the underlying characters in plastic, even though ... [i]t undoubtedly involved some degree of manufacturing skill, does not constitute originality"); *Gallery House, Inc. v. Yi,* 582 F.Supp. 1294, 1297 (N.D.Ill.1984) (holding that the plaintiff moldmaker had not added any "artistic effort" since he had "simply converted a two-dimensional design to a three-dimensional object").

ERG also argues that a material issue of fact exists with regard to originality due to the photographs and artwork attached to Mr. Breed's declaration that allegedly demonstrate that the costumes involve much more than "merely trivial" additions and alterations to the underlying copyrighted characters. Specifically, ERG contends that the differences between the representations of the characters in the flat reference artwork supplied by the characters' proprietors and their representations in the three-dimensional inflatable costumes are far from trivial since (1) the ERG costumes vary greatly in

proportions and facial expressions from the original characters and (2) the ERG costumes contain many elements, such as the texture of the costumes and the manner in which they move which are wholly absent from the original artworks.

Viewing the three-dimensional costumes and the two-dimensional drawings upon which they are based, it is immediately apparent that the costumes are not exact replicas of the two-dimensional drawings. Indeed, as the district court observed with regard to the Toucan Sam costume, the proportions in the costumes are far different from those in the underlying drawings. However, as was discussed earlier, in evaluating the originality of ERG's costumes, any differences that exist because of functional or mechanical considerations should not be considered. The district court came to the conclusion that these differences in proportion were solely—or at least primarily—driven by the functional considerations necessitated by the fact that a human body must fit inside the costumes. Accordingly, the district court discounted any differences such as proportionality that were primarily caused by functional concerns.

We agree with the district court's conclusion that the differences in form, texture and proportionality that ERG points to as non-trivial differences all stemmed from functional considerations. Indeed, even though Mr. Breed states that he was forced to make an "artistic decision" as to what changes should be made to the costumes so that the original character's essence would not be lost, a close reading of Mr. Breed's statement reveals that this "artistic decision" was necessitated solely by the functional consideration that "the scale of the character does not fit the human proportion" and, therefore, must be changed so that the costumes can be functional. Accordingly, these so-called artistic differences are really nothing more than changes necessitated by utilitarian concerns. As such, these differences were appropriately not considered by the district court.

ERG does point to one truly "artistic" difference, however, as ERG claims that the facial expressions of the costumes contain more than merely trivial differences from the facial expressions seen in the underlying drawings. Although ERG is correct that there are some differences in these facial expressions, no reasonable trier of fact would see anything but the underlying copyrighted character when looking at ERG's costumes. Indeed, much like the Second Circuit in *Durham* concluded when looking at those three-dimensional derivative works, "Tomy [i.e., ERG] has demonstrated, and the toys [costumes] themselves reflect, no independent creation, no distinguishable variation from preexisting works, nothing recognizably the author's own contribution that sets Tomy's figures apart from the prototypical Mickey, Donald, and Pluto [Toucan Sam, Geoffrey the Giraffe, Pillsbury Dough Boy, etc.], authored by Disney [Kellogg's, Toys 'R' Us, Pillsbury, etc.] and subsequently represented by Disney or its licensees in a seemingly limitless variety of forms and media." *Durham,* 630 F.2d at 910. In other words, because ERG's costumes are "instantly identifiable as embodiments" of the underlying copyrighted characters in "yet another form," no reasonable juror could conclude that there are any "non-trivial" artistic differences between the underlying cartoon characters and the immediately recognizable costumes that ERG has designed and manufactured. *Id.* at 908–09.

This conclusion makes even more sense in view of the fact that ERG's customers—the companies—wanted costumes replicating their characters. Thus, because ERG followed detailed instructions from its customers regarding exactly how they wanted the costumes to appear, it can not be said that ERG's artistic contributions were more than merely trivial contributions.

ERG cites our decision in *North Coast* for the proposition that summary judgment is inappropriate here since the issue of whether ERG's artistic contributions are trivial is a disputed question of fact that should be reserved for the jury. *See North Coast,* 972 F.2d at 1034–35 (holding that whether the differences between a print for a dress and Mondrian paintings were non-trivial could not be determined as a matter of law at summary judgment). *North Coast* does not establish that summary judgment is inappropriate, however. Indeed, under the very language of *North Coast,* summary judgment in favor of a defendant is sometimes appropriate in certain copyright actions "where no

reasonable trier-of-fact could find even trivial differences" between the original works and the reproductions. *Id.* at 1034 (citing *Durham* for this proposition).

The instant case is also distinguishable from the circumstances in *North Coast* because in *North Coast,* the artistic contributions that the district court examined and found trivial were deemed to be the heart of the entire derivative work of art at issue. Because those contributions were so crucial to the derivative work, there was a clear possibility that a reasonable trier of fact would find the derivative works to be recognizably the derivative creator's own product. Thus, we felt it improper for the district court to resolve the matter on summary judgment. Here, on the other hand, the claimed artistic differences in the facial expressions of the characters are clearly not the defining aspect of the costumes. In other words, while there may be some differences between the facial expressions represented on ERG's costumes and those in the underlying copyrighted characters, in the context of the overall costume, these distinctions are so slight that no reasonable trier of fact would see anything but a direct replica of the underlying characters. Therefore, while it was not appropriate for the district court in the *North Coast* circumstances to determine on summary judgment that the artistic contributions there were not more than "merely trivial," it was perfectly appropriate for the district court in the instant circumstances to rule that no reasonable trier of fact could find any non-trivial artistic differences between ERG's costumes and the copyrighted characters the costumes were based on.

In sum, because Mr. Breed's Declaration and the photographs and artwork submitted in conjunction with his declaration do not raise any disputed factual issue as to whether there are any non-trivial artistic differences between ERG's costumes and the underlying copyrighted characters, the district court's grant of summary judgment was appropriate.

### 2. *Prong 2 of the Durham Analysis*

■ In addition to concluding that ERG did not establish sufficient originality to war-

rant copyright protection for its derivative costumes, the district court also concluded that ERG failed to satisfy the second element of the *Durham* test which states that derivative works are not copyrightable if they "affect the scope of any copyright protection in that preexisting material." *Durham,* 630 F.2d at 909. Explaining its reasoning, the district court stated that, "Any subsequent costume makers and the original copyright holders themselves ... would be limited by the granting of a derivative copyright in this situation or at the very least be vulnerable to harassment." *Entertainment Research Group,* 853 F.Supp. at 324. Accordingly, the district court concluded that, "[T]he fear of the Durham Court and this court as well, is that ERG would have a pseudo-monopoly" on all inflatable costumes depicting these characters. *Id.*

Given the fact that ERG's costumes are so similar to the well-known copyrighted characters that they are based upon, the district court was correct to conclude that granting ERG a copyright in its costumes would have the practical effect of providing ERG with a de facto monopoly on all inflatable costumes depicting the copyrighted characters also in ERG's costumes. Indeed, if ERG had copyrights for its costumes, any future licensee who was hired to manufacture costumes depicting these characters would likely face a strong copyright infringement suit from ERG. Thus, in the instant circumstances, much like in other cases discussing this very proposition, *see, e.g., Gracen,* 698 F.2d at 304–05; *Durham,* 630 F.2d at 910; *Moore Pub.,* 756 F.Supp. at 1374, the district court was correct to deny copyright protection to ERG's derivative works on the ground that the rights of the holder of the underlying copyrighted characters would be affected.

In addition, because no one can claim to have independently evolved any particular medium or form and to, thus, corner the market on such a medium or form of expression, *see* Nimmer § 2.08[C] at 2–112, it would be wrong to grant ERG a copyright in its costumes.

Accordingly, for these reasons also, the district court was correct to grant summary judgment against ERG.[7]

---

**7.** Because of this recommendation, it is not nec- essary to address Aerostar's and amicus Toys 'R'

## II. Breach of Oral Agency Contract Cause of Action

■ One of ERG's most fundamental allegations is that Genesis owed ERG a fiduciary duty of loyalty and that Genesis breached this duty by secretly working with Aerostar to compete with ERG.[8] ERG claims that Genesis owed ERG this duty due to the existence of an agency contract under which Genesis allegedly agreed to act as ERG's exclusive agent. It is undisputed that no written agency contract existed. Instead, ERG argues that an oral contract existed.[9]

The district court granted summary judgment against ERG on its claim for breach of an oral contract on the ground that ERG failed to establish any evidence of a final agreement, either in writing or in the conduct of the parties. *See* 1 B. Witkin, Summary of California Law, Contracts §§ 128, 133, 136, 145 (9th ed.1988) (stating that preliminary negotiations will result in a binding contract when all of the terms are definitely understood and agreed upon).

In light of this standard requiring a final agreement, and in light of the evidence presented in the record, we affirm the district court's ruling that ERG failed to raise a genuine issue of fact suggesting the existence of an oral contract creating an agency relationship. ERG pointed to the following pieces of evidence as support for its claim that such an agency relationship existed by virtue of an oral contract: (1) the fact that the parties did over $750,000 in business over a two-year period; (2) the July 2, 1990 letter written by Genesis to Mr. Breed and referred to as the "Deal Point Memorandum"; (3) the use of the word "commission" in that letter and in the subsequent termination letter of August 23, 1991; and (4) the Confidential Disclosure Agreement signed by Genesis

employees. We are not persuaded by any of these arguments.

Beginning with ERG's first piece of evidence, the mere fact that Genesis and ERG engaged in various business dealings involving approximately $750,000 in sales does not compel the conclusion that the parties had reached a final agreement. Indeed, although it is true that common sense dictates that some type of agreement must have existed between ERG and Genesis since so much money changed hands, common sense also tells us that this fact reveals absolutely nothing as to what kind of relationship existed between the two parties and as to whether Genesis had agreed to be the exclusive agent for ERG.

The "Deal Point Memorandum" sent from Mr. Bodien of Genesis to Mr. Breed of ERG that ERG claims is the embodiment of the final agreement between the two parties also does not further ERG's argument.[10] This Deal Point Memorandum expressly states that, "The enclosed information is in regards to the contract which we have been discussing." Accordingly, at this point in time— July 2, 1990—it is clear that no final contract had yet been entered into. This fact alone refutes ERG's first argument that an agency contract can be implied from the fact that ERG and Genesis were doing business together, as it is clear that though the first ERG–Genesis sales began in February of 1989, in July of 1990, there was still no contract.

Moreover, the Deal Point Memorandum goes on to state that, "Some of the items we aren't real clear on what you meant, so if you could please review and fill us in." No reasonable trier of fact could read this sentence as meaning anything other than that at the time of its writing, the parties were still

---

Us's argument that as a practical matter, ERG can not be given a copyright in its derivative works since ERG was not licensed to obtain such copyrights.

8. Building upon this idea, ERG has alleged that Genesis and Aerostar were co-conspirators or agents such that Aerostar can be held liable for all of Genesis's alleged wrongs.

9. ERG's opening brief also claims that an implied-in-fact agency contract existed. This claim

was not raised before the district court. Accordingly, we will not consider this issue. *See, e.g., United States v. One 1978 Piper Cherokee Aircraft,* 37 F.3d 489, 494 (9th Cir.1994) (stating that, "Although we have discretion to review issues not raised below, we do so only in *exceptional* circumstances to prevent manifest injustice.").

10. It should be noted that this July 2, 1990 letter referred to as the "Deal Point Memorandum" by ERG is not labeled as such anywhere on the letter.

discussing the terms of the contract and wanted some clarification before any final agreement would be reached. Thus, contrary to ERG's assertions, the so-called Deal Point Memorandum can not be considered to constitute the required final agreement between the parties.

This conclusion is buttressed by subsequent communications between the parties. On September 7, 1990, having received no reply from Mr. Breed to the request quoted above, Mr. Bodien sent Mr. Breed another letter indicating that, "[T]o date nothing has happened" regarding the proposed contract between ERG and Genesis. Mr. Breed's letter in response to this letter from Mr. Bodien concedes that the Deal Point Memorandum did not finalize any contract, stating that, "I am very reluctant, and have been since the beginning, to enter into an agreement with a company that primarily represents itself and not ERG." Thus, the evidence in the record beyond question refutes ERG's claim that a final agreement was reached as of July 2, 1990 (the date of the Deal Point Memorandum).

The fact that the Deal Point Memorandum and the August 23, 1991 "termination" letter sent to Mr. Breed by Mr. Dykstra of Genesis both used the word "commission" also does not demonstrate that Genesis and ERG had entered into an agency contract. Though ERG had proposed a 20–percent commission structure, Genesis introduced unrefuted evidence into the record establishing that Genesis never agreed to accept such a commission structure, despite the inclusion of the word "commission" in these two letters. Indeed, it is clear from the record that Genesis's markup, or "commission," on all of the sales involving ERG's costumes ranged from 22 to 87 percent. Accordingly, it is quite a stretch for ERG to argue that the mere use of the word "commission" in these two letters is the smoking gun establishing that Genesis had in fact agreed to the final terms of a contract with ERG.

The Confidential Disclosure Agreement signed by Genesis employees also does not substantiate ERG's claim that an agency contract had been entered into. Indeed, a close reading of this agreement reveals that it actually supports Genesis's position that no agency contract existed. Specifically, the agreement states that it is to be signed "[f]or the sole purpose of your evaluation of the propriety of entering into more formal arrangements and agreements." Hence, the disclosure agreement actually provides evidence that a final agency contract had not, at least at that point—September 18, 1990—been entered into yet.

In sum, because ERG failed to introduce any evidence suggesting that a final agreement was reached between ERG and Genesis, no reasonable juror could conclude that any binding agency agreement existed between ERG and Genesis. As a result, because there was no oral agency contract to be breached, it was perfectly appropriate for the district court to rule that ERG's claim for breach of an oral contract must fail as a matter of law.

### III. Breach of Confidentiality Cause of Action

 ERG's third cause of action is based on its belief that Genesis violated the parties' Confidential Disclosure Agreement by disclosing confidential information to Aerostar regarding the design, manufacture and pricing of ERG's inflatable costumes and component parts.[11]

 California case law recognizes a cause of action in tort for breach of confidence. *See, e.g., Faris v. Enberg,* 97 Cal. App.3d 309, 321, 158 Cal.Rptr. 704 (1979). This tort is based upon the concept of an implied obligation or contract between the

---

11. The Confidential Disclosure Agreement specifies that the signer acknowledges that ERG has "valuable proprietary and technical information" and that the signer acknowledges ERG's property rights to "documents, drawings, sketches, designs, copyrights, trademarks, patent applications, or materials and Information of any kind." The Disclosure Agreement also provides that, "You [the signer] understand and agree that the Information is confidential, and agree that you shall not disclose the Information to anyone for any purposes." The Disclosure Agreement was signed by Ronald Dykstra, the President of Genesis, on September 18, 1990, and by Glenn Bodien, Sales Manager for Genesis, and Suzanne Stolt, Genesis's Production Supervisor, on September 17, 1990.

parties that confidential information will not be disclosed. *See, e.g., Tele–Count Eng'rs, Inc. v. Pacific Tel. & Tel. Co.*, 168 Cal.App.3d 455, 462, 214 Cal.Rptr. 276 (1985); *see also Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 489 (9th Cir. 1984). In other words, this cause of action recognizes "an obligation in law where in fact the parties made no promise. It is not based upon apparent intentions of the involved parties; it is an obligation created by law for reasons of justice." *Fink v. Goodson–Todman Enterprises, Ltd.*, 9 Cal.App.3d 996, 1010, 88 Cal.Rptr. 679 (1970) (citation omitted).

■■■ To prevail on a claim for breach of confidence under California law, a plaintiff must demonstrate that: (1) the plaintiff conveyed "confidential and novel information" to the defendant; (2) the defendant had knowledge that the information was being disclosed in confidence; (3) there was an understanding between the defendant and the plaintiff that the confidence be maintained; and (4) there was a disclosure or use in violation of the understanding. *See, e.g., Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 903 (9th Cir.1987) (citing *Tele–Count Eng'rs*, 168 Cal.App.3d at 462–66, 214 Cal.Rptr. 276 (1985)).

■■■ Information need not be protectable either as a trade secret, *see Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 465–67 (9th Cir.1990), or by copyright law, *see Tele–Count Eng'rs*, 168 Cal. App.3d at 462–66, to be the subject of a breach of confidentiality claim. However, the information disclosed "must be confidential and novel to warrant protection." *Id.* 168 Cal.App.3d at 462; *see also Faris*, 97 Cal.App.3d at 322–23. Accordingly, the key to ERG's breach of confidence claim is whether the information conveyed to Genesis by ERG was "confidential and novel."

We affirm the district court's grant of summary judgment on this cause of action because—even assuming that ERG can meet all of the other elements—ERG can not establish that it conveyed any "confidential and novel information" to Genesis. ERG and Genesis began their relationship—whatever it may have been—at some time in 1989. It is undisputed that by that time, ERG had

already placed several of its inflatable costumes on the market through its previous sales to assorted customers. After Genesis began to sell ERG's costumes to the customers Genesis located, ERG did not require any of these purchasers to execute non-disclosure agreements. Accordingly, it can be presumed that in all of its sales prior to Genesis's arrival into the picture, ERG likewise did not require any type of non-disclosure agreement to be signed by the purchasers. ERG has not offered any evidence suggesting otherwise, and in fact, there is substantial evidence indicating that ERG never took any steps to prevent other manufacturers from looking inside ERG's costumes and reverse-engineering them.

The absence of any non-disclosure agreements entered into by these previous purchasers is dispositive of the instant breach of confidence claim. In *Aliotti*, 831 F.2d at 903, we held that the plaintiff could not have conveyed any "confidential" information to the defendant concerning her products for the express reason that three of the dolls in question—the products at issue—were already on the market. Because no confidential information was conveyed, we granted summary judgment there against the plaintiff on her breach of confidence cause of action. Likewise, in the instant case, we affirm the district court's grant of summary judgment to Genesis and Aerostar since because ERG's costumes were already on the market before Genesis became involved, any design or manufacturing "information" that ERG may have disclosed to Genesis was not "confidential" as a matter of law. *See id.* Thus, even though the Disclosure Agreement states that the information conveyed was "confidential," as a matter of law, this information was actually not "confidential." *Id.*

■■■ In this regard, it is important to note that "reverse-engineering" is perfectly legal in a product not protected by a patent. *See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156–58, 109 S.Ct. 971, 980–81, 103 L.Ed.2d 118 (1989); *Chicago Lock Co. v. Fanberg*, 676 F.2d 400, 404–05 (9th Cir.1982). Accordingly, by not requiring the purchasers of its costumes to sign non-disclosure agreements, ERG gave up any

ability it may have had to claim that the manufacturing and design information disclosed to Genesis was "confidential in nature."

 In addition to this claim that Genesis disclosed confidential information about ERG's manufacturing and design processes, ERG also argues that Genesis breached the confidence it owed to ERG by disclosing to Aerostar the prices that purchasers were paying for ERG-manufactured costumes. We also reject this argument on the ground that such information was not confidential. In the first place, the prices allegedly improperly disclosed were the prices that Genesis—not ERG—charged the purchasers. Thus, the price information was, if confidential at all, Genesis's confidential information—not ERG's. In addition, price information is not covered in the definition of "Information" detailed in the Disclosure Agreement, so Genesis technically would not have violated the Disclosure Agreement by disclosing any pricing information.

For the forgoing reasons, the district court's grant of summary judgment to defendants on ERG's breach of confidence cause of action was correct. Although ERG argues that the question of whether the information conveyed by ERG to Genesis was confidential should have been left for the jury, this contention is without merit since any information ERG conveyed to Genesis was not confidential as a matter of law. *See Aliotti,* 831 F.2d at 902–03.

## IV. Civil Conspiracy Cause of Action

ERG's final cause of action alleges that Genesis and Aerostar are liable to ERG as co-conspirators under a civil conspiracy theory. The district court granted summary judgment against ERG on this claim on the ground that in the instant circumstances, ERG could not state such a cause of action under California law.

 Under California law, there is no separate and distinct tort cause of action for civil conspiracy. *See, e.g., Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 480, 869 P.2d 454, 459 (1994) (stating that, "Conspiracy is not an independent tort; it cannot create a duty or abrogate an immunity. It allows tort

recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles.") (citing *Doctors' Co. v. Superior Court,* 49 Cal.3d 39, 260 Cal.Rptr. 183, 775 P.2d 508 (1989)); *see also* 5 B. Witkin, *Summary of California Law,* Torts § 44 (9th ed.1988) (stating that, "Strictly speaking, however, there is no separate tort of civil conspiracy, and there is no civil action for conspiracy to commit a recognized tort unless the wrongful act itself is committed and damage results therefrom.").

Accordingly, regardless of whether Genesis and Aerostar formed such a conspiracy, in order for ERG to have a valid civil conspiracy cause of action, there must be another tort upon which ERG could base its conspiracy claim. *Id.* Although ERG attempts to argue that it is enough for ERG to simply have alleged underlying causes of action in its complaint, merely alleging underlying tort causes of action is clearly insufficient to support a conspiracy cause of action. *See Applied Equipment,* 28 Cal.Rptr.2d at 478, 869 P.2d at 457. Thus, because we have decided to affirm the district court's grant of summary judgment as to all of the other tort causes of action, summary judgment is also appropriate for ERG's civil conspiracy claim since no underlying tort exists.

## V. The Award of Attorney's Fees to Genesis

On October 2, 1996, the district court issued an amended order awarding Genesis $95,075.75 in attorney's fees incurred in defending against ERG's first and second causes of action, the Inflatimation claims. ERG appeals this award on two grounds: (1) the district court committed clear error by awarding any attorney's fees to Genesis since ERG's Inflatimation claims were properly brought and since Genesis was an admitted infringer; and (2) the district court's award of $95,075.75 was an unreasonable amount and, therefore, an abuse of discretion.

### A. *Appropriateness of Attorney's Fees Award to Genesis*

 We have established that "an award of attorney's fees to a prevailing defendant

that furthers the underlying purposes of the Copyright Act is reposed in the sound discretion of district courts." *Fantasy*, 94 F.3d at 555. Moreover, "[S]uch discretion is not cabined by a requirement of culpability on the part of the losing party." *Id.*

 Within this framework, district courts are given wide latitude to exercise "equitable discretion." *See generally, Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). Some of the factors that can affect a district court's decision are: (1) the degree of success obtained; (2) frivolousness; (3) motivation; (4) the objective unreasonableness of the losing party's factual and legal arguments; and (5) the need, in particular circumstances, to advance considerations of compensation and deterrence. *Id.* at 534 n. 19, 114 S.Ct. at 1033 n. 19; *see also Jackson v. Axton*, 25 F.3d 884, 890 (9th Cir.1994).

In the instant case, the district court decided to exercise this discretion by denying recovery of attorney's fees to both Aerostar and Genesis for defending against ERG's derivative copyright claim on the ground that the legal issues were quite novel and ERG's arguments quite plausible. In direct contrast, the district court held that Genesis should be awarded attorney's fees for defending against ERG's two copyright causes of action based on the Inflatimation characters since it was "objectively unreasonable" for ERG to have maintained those claims for almost three years without any evidentiary basis.

ERG argues that the district court was incorrect to award these attorney's fees since ERG's Inflatimation claims were properly brought and since Genesis "admitted to wrongdoing." The record does not support ERG's contention that Genesis "admitted to wrongdoing," however. Indeed, although Genesis's opposition memorandum to ERG's September, 1992 preliminary injunction motion did acknowledge that Genesis employees had distributed advertising materials containing pictures of ERG-manufactured costumes—the basis for the Inflatimation claims—Genesis soon cleared up any confusion by stating that the only brochures it ever distributed depicting ERG costumes were done with the full authorization of Mr.

Breed, the president and sole shareholder of ERG.

ERG's contention that Genesis was an admitted infringer is especially hard to believe given the fact that at the May 11, 1995 hearing on Genesis and Aerostar's motions for summary judgment, ERG did not even try to argue for the validity of its first and second causes of action. Quite to the contrary, ERG's counsel candidly conceded that ERG had no evidence whatsoever to substantiate its claims of copyright infringement of the Inflatimation Elf and Soldier costumes.

ERG attempts to justify its retention of these claims on the ground that it would have been legal malpractice for its counsel to remove such perfectly valid claims from the complaint. Given the fact that ERG had no evidence at all to support these claims—even after three years and numerous depositions—it would hardly have been legal malpractice to drop such claims. In fact, ERG's counsel really should not have even included the claims in the first place. Thus, this argument does not convince us that the award of attorney's fees was not warranted. *See Hughes v. Novi American, Inc.*, 724 F.2d 122, 125 (Fed.Cir.1984) (stating that the fact that a plaintiff's lawyer knows that the plaintiff's copyright claims are not valid is a factor meriting an award of attorney's fees).

Therefore, because the evidence in the record reveals that ERG never had any evidence to support its Inflatimation claims, the district court properly found that it was objectively unreasonable for ERG to have maintained these claims. Accordingly, the district court did not err in deciding to award attorney's fees to Genesis as the prevailing party. *See, e.g., Fantasy*, 94 F.3d at 560 (holding that, "Since the reasons given by the district court in this case are well-founded in the record and are in keeping with the purposes of the Copyright Act, the court acted within its discretion in awarding a reasonable attorney's fee"); *Diamond v. Am–Law Pub. Corp.*, 745 F.2d 142, 148 (2d Cir.1984) (holding that where the plaintiff's copyright infringement claim was without a reasonable legal basis, an award of attorney's fees to the defendants was a proper exercise of judicial discretion).

**B. *Reasonableness of the Amount of Attorney's Fees Awarded***

It is well-established law that a party entitled to attorney's fees as a prevailing party on a particular claim, but not on other claims in the same lawsuit, can only recover attorney's fees incurred in defending against that one claim or any "related claims." *See, e.g., Hensley v. Eckerhart,* 461 U.S. 424, 434–35, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983); *Ackerman v. Western Elec. Co., Inc.,* 860 F.2d 1514, 1520 (9th Cir.1988). Indeed, as the Supreme Court commented in *Hensley:*

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants ... counsel's work on one claim will be unrelated to his work on another claim ... The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Hensley,* 461 U.S. at 434–35, 103 S.Ct. at 1940; *see also Smith v. Robinson,* 468 U.S. 992, 1006–07, 104 S.Ct. 3457, 3465–66, 82 L.Ed.2d 746 (1984); *Schwarz v. Sec. of Health & Human Services,* 73 F.3d 895, 903 (9th Cir.1995) (affirming the district court's decision to refuse to award fees incurred on claims for which attorney's fees were not available where the "course and conduct about which she [plaintiff] complained [in these other claims] ... were entirely distinct and separate" from the claims upon which fees were awarded).

In the instant case, ERG's second amended complaint raised twelve causes of action. Exercising its discretion, the district court decided that attorney's fees should only be awarded to Genesis for those fees Genesis incurred in defending against ERG's two copyright claims based on the Inflatimation Elf and Soldier costumes. Those two copyright claims alleged that Genesis employees had distributed to third parties advertising materials and brochures depicting ERG-made costumes without ERG's authorization or consent. The crux of these claims, there-

fore, was whether such unauthorized distributions ever took place. The crux of the overall litigation and the other causes of action, on the other hand—besides the derivative copyright infringement claim—was whether an agency relationship existed between Genesis and ERG. In addition, all of the other causes of action—except for the derivative copyright claim—involved completely different legal theories and questions. Further, the mere fact that the Inflatimation claims were a part of this overall case and involved the same parties does not mean that these claims arose from the same "course and conduct" as the other claims. *See Schwarz,* 73 F.3d at 903. As should be readily apparent, therefore, the Inflatimation claims presented "distinctly different claims for relief that are based on different facts and legal theories" from the other causes of action in the overall litigation. *See Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940. Accordingly, under the rule requiring segregation of attorney's fees, *id.* at 434–35, 103 S.Ct. at 1939–40, the district court should not have awarded Genesis any attorney's fees incurred in doing work on these other claims.

The district court's original order regarding attorney's fees and its amended order reflect the district court's awareness of these principles. The district court even noted that it had the discretion to ask Genesis to submit its detailed time records or original bills so that the appropriate segregation could occur. The district court declined to impose such a requirement in the instant circumstances, however. Instead, the district court relied exclusively on the declaration submitted by Genesis's counsel detailing the hours spent on the Inflatimation claims to conclude that $95,075.75 in attorney's fees had been incurred in defending against the Inflatimation claims.

The Supreme Court has detailed a district court's obligations pursuant to the requirement that attorney's fees be awarded only for time spent on allowable claims as follows:

> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the

limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.

*Hensley,* 461 U.S. at 436–37, 103 S.Ct. at 1941. In line with the Supreme Court's directive, we have held that a district court can abuse its discretion in certain circumstances by not requiring the party requesting attorney's fees to submit any materials besides summaries of the time expended to litigate a matter. *See Intel v. Terabyte Int'l, Inc.,* 6 F.3d 614, 623 (9th Cir.1993). Given the instant circumstances, we feel that the district court abused its discretion by concluding that the summaries submitted in conjuction with the declaration of Genesis's counsel were sufficient to determine exactly how many hours Genesis spent solely defending against the Inflatimation claims. Indeed, in these circumstances, we believe that the district court erred in not requiring Genesis to submit its original time records and billing statements so that ERG—and the district court—could determine whether the fees being claimed were truly for time spent in defending against the Inflatimation claims. *See Intel,* 6 F.3d at 623.

In making its determination that $95,075.75 should be awarded as attorney's fees to Genesis for defending against the Inflatimation claims, the district court relied on the declarations submitted by Genesis's attorney and the billing summaries submitted in conjunction therewith. Genesis provided the district court with one chart summarizing all of the time spent and the fees incurred in defending against all three of ERG's copyright claims—the two Inflatimation claims and the derivative copyright claim—and with a second chart summarizing the time spent exclusively on the Inflatimation claims. According to these summaries, over $70,000 in legal fees were incurred by Genesis in defending solely against the Inflatimation claims from September, 1992 to September, 1993. Given the facts surrounding this case, this amount is so surprising that the district court abused its discretion by not requiring Genesis to submit its original time records and billing statements so that the district court could determine if the claimed attorney's fees were incurred solely for the Inflatimation claims and not for other unrelated causes of action.

In September, 1992, Genesis told ERG that regardless of whether the unauthorized distributions complained of in ERG's Inflatimation claims had ever taken place, such allegedly violative acts would no longer occur since all of Genesis's advertising materials containing the allegedly unauthorized depictions of ERG-made costumes had been exhausted. Thus, to Genesis, the issue had become moot by this time. Based on this view, Genesis informed ERG that it would stipulate to the fact that ERG would no longer be harmed—if ERG had ever been—by such distributions. Accordingly, by September, 1992, most of the force behind ERG's two Inflatimation copyright claims had all but disappeared. That this is true is further evidenced by the fact that ERG stopped pursuing these claims after its motion for a preliminary injunction was taken off calendar by the district court on September 17, 1992 on the ground that there was no threat of further harm to ERG from such distributions.[12]

Despite this turn of events, ERG still included these two claims in its subsequently filed first and second amended complaints. As a result, Genesis deemed it necessary—out of an appropriate abundance of caution—to prepare for the possibility that ERG would once again attempt to vigilantly prosecute these claims at some point. Given the fact that the Inflatimation claims had lost most of their force since ERG would no longer suffer any such harm, however, it is clear that by September, 1992, there was no real reason for Genesis to conduct anything more than cursory legal and factual preparations regarding these two Inflatimation claims. Consequently, we are skeptical that Genesis could have spent over $70,000 in legal fees on these two claims from September, 1992 to September, 1993.

Genesis's claimed $70,000 in legal fees incurred post-September, 1992 is also notable due to the fact that these two copyright claims involved very simple legal and factual issues. Indeed, as was mentioned before, the

---

**12.** At this time, the case was still before United States District Judge Stanley Weigel.

entire Inflatimation claims revolved around the simple and easily discoverable—especially for Genesis—factual issue of whether Genesis employees had distributed any advertising materials depicting ERG's costumes without ERG's authorization. Extensive discovery was not necessary to answer this question. Nor was extensive travel necessary. Of even more import, by September of 1992, Genesis had all the information it needed—it knew that the materials had been distributed at one time, and it knew that they were no longer being distributed. Accordingly, Genesis's claim that it spent over $70,000 in legal fees on these claims alone after September, 1992 should have at least raised some suspicions such that the district court should have required Genesis to submit its original billing records.

These suspicions should have been heightened even more by a comparison of this $70,000 figure with the amount of attorney's fees that Genesis claimed it expended in defending against the derivative copyright infringement suit. As our earlier discussion reveals, the derivative copyright claim involved infinitely more complex and intricate factual and legal issues than ERG's two Inflatimation copyright claims. Indeed, it is principally for this reason that the district court decided not to award any attorney's fees at all to Genesis or Aerostar for defending against the derivative copyright claim, even though both parties were statutorily entitled to such fees.

Given this context, it should come as quite a surprise that, according to the prepared declaration and billing summaries submitted by Genesis to the district court, the entire amount of attorney's fees incurred by Genesis in defending against the derivative copyright action was only $43,343.75. In other words, after September, 1992—by which time the Inflatimation copyright claims had really lost all of their force and legitimacy—Genesis apparently spent almost twice as much money defending against the unsubstantiated Inflatimation copyright claims as it ever expended for its defense of the novel and complex derivative copyright lawsuit.

In light of the forgoing, the district court abused its discretion by not requiring Genesis to submit its original time records and billing statements. Absent such records and absent a summary of the total amount of attorney's fees incurred by Genesis in defending against all of ERG's causes of action between September, 1992 and September, 1993, the district court could not properly ensure that the attorney's fees it was granting to Genesis were solely for fees related to the Inflatimation copyright claims. In sum, because this overall litigation involved numerous other claims for which attorney's fees were not awarded—almost all of which contained more complicated factual and legal questions than the Inflatimation copyright claims—and because the amount of attorney's fees Genesis claimed were incurred to defend solely against the Inflatimation claims was so high, the district court abused its discretion by not requiring the submission of more detailed billing records. *See Intel*, 6 F.3d at 623. As a result, we vacate the district court's award of $95,075.75 in attorney's fees to Genesis and remand the case to the district court for further consideration.[13]

## CONCLUSION

For the forgoing reasons, we affirm the district court's orders granting summary judgment in favor of Genesis and Aerostar on all twelve of ERG's causes of actions. However, we vacate and remand the district court's award of attorney's fees to Genesis.

AFFIRMED in part, VACATED in part, and REMANDED.

---

**13.** We hasten to add that we do not mean to impute to Genesis or to its attorneys any intent to mislead the court. But one does not always see one's own situation with the perspicacity available to one's opponents. That is one reason for supplying records to opposing counsel when there are any doubts at all.